## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Schwan's IP, LLC, and
Schwan's Consumer Brands North America, Inc.

Plaintiffs and Counter-Defendants,                    **ORDER**

v.
                                                      Civil No. 04-125 (MJD/JGL)
Kraft Pizza Company,

Defendant and Counter-Claimant.

Scott W. Johnston, Allen W. Hinderaker, and Ernest W. Grumbles III, Merchant & Gould P.C., Counsel for Plaintiffs and Counter-Defendants.

Alan A. Anderson and Sharna A. Wahlgren, Fulbright & Jaworski LLP.; Paul R. Garcia and Kevin S. Ueland, Kirkland & Ellis LLP, Counsel for Defendant and Counter-Claimant.

## I.    INTRODUCTION

This is a trademark dispute regarding the use of the term BRICK OVEN[1] in describing frozen pizzas. Defendant Kraft Pizza Company ("Kraft") has filed two motions for summary judgment on the trademark claim of Plaintiffs Schwan's IP, LLC, and Schwan's Consumer Brands North America, Inc. (collectively, "Schwan's"). Kraft's first motion seeks judgment under Fed. R. Civ. P. 56, arguing that BRICK OVEN is generic, is descriptive and lacks secondary meaning, or—in the alternative—that Kraft's use of that term constitutes fair use. Kraft's second motion seeks judgment as a matter of law that no reasonable jury could find a

---

[1] This memorandum shall capitalize asserted trademarks to minimize the number of quotation marks.

likelihood of confusion stemming from its use of the term BRICK OVEN. For the reasons that follow, summary judgment is appropriate.

## II.  FACTUAL BACKGROUND

Kraft and Schwan's are the two largest producers and suppliers of frozen pizzas in the United States, both selling a variety of brands between $1.50 and $8.

### A.  Schwan's BRICK OVEN Product

Plaintiff Schwan's is the second-largest producer and supplier of frozen pizzas in the United States, with a grocery market share of approximately 27%. Schwan's pizza brands include: RED BARON, TONY'S, and Schwan's premium brand, FRESCHETTA. In 2003, Schwan's gross U.S. sales of its FRESCHETTA frozen pizzas totaled $190 million.

In 2000, Schwan's sought to develop a new line of pizzas under its FRESCHETTA brand, and its efforts resulted in a square, fire-baked pizza with sauces and toppings that were not, at that time, typical in the frozen pizza market. In this new product, the crust is partially baked in a conveyor oven lined by ceramic tiles; the sauce, toppings, and cheese are applied in a different Schwan's facility; and the pizzas are baked fully in the consumer's conventional home oven.

Schwan's considered several names for its new product, including EARTH FIRED, STONE HEARTH, HEARTH BAKED and STONE BAKED, but it eventually chose the

brand BRICK OVEN. Schwan's asserts that it spent $500,000 in consumer tests relating to that term. While some consumers believe the term is "vague" and does not provide "specifics that would make them understand what the pizza would taste like," other consumers believe the term conveys ideas such as: fresh, highest quality, Italian restaurant, different, and upscale.

When Schwan's began using the BRICK OVEN mark in 2003, no other frozen pizza on the market used that term. But beginning more than ten years earlier, from 1992 to 1996, Weight Watchers marketed a frozen pizza under the brand BRICK OVEN STYLE. And after Schwan's began using the term, Market Day began selling a BRICK OVEN frozen pizza, and Meijer similarly offered a BRICK OVEN STYLE frozen pizza.

Schwan's internally announced the release of BRICK OVEN pizzas to its sales personnel in December 2002, shipped product samples to the field in January 2003, and distributed nationally to grocery stores on March 8, 2003. Schwan's began advertising the brand on March 24, 2003. Within six months, Schwan's BRICK OVEN pizzas reached more than eighty percent of the retail grocery store market, and within nine months, more than 10.5 million units were sold. Schwan's claims that it has spent over $17 million in mark selection, advertising, tracking studies, slotting, and promotion of the BRICK OVEN brand and product.

### B.    Kraft's BRICK OVEN Product

Kraft is the nation's largest producer of frozen pizzas, selling under the brands DiGIORNO, TOMBSTONE, CALIFORNIA PIZZA KITCHEN, and JACK'S. In 2003, Kraft considered using the term BRICK OVEN with its DiGIORNO product but concluded that the term "Brick Oven does not have a clearly defined meaning to consumers—consider this a fanciful term." Kraft ultimately rejected the mark, concluding that BRICK OVEN has "the least amount of potential of the six Tombstone concepts tested."

In October 2003, seven months after Schwan's BRICK OVEN launch, Kraft sent an e-mail to packaging vendors, stating "WE HAVE A POTENTIAL 'HAIR ON FIRE' PROJECT FOR YOU ALL: Scenario: Launch a Tombstone branded BRICK OVEN STYLE PIZZA," with "packaging objectives" that include "communicat[ing] BRICK OVEN to compete directly with Freschetta in non-core markets."

Kraft sought to place "pricing pressure on FRESCHETTA with a cheaper product," ultimately choosing to "[u]tilize the naming Brick Oven Style as opposed to Brick Oven to denote similarities." Kraft code-named its strategy "Project Rightguard: Our Best Defense against BO [BRICK OVEN]." Its design firm stated that it would "'Use Brick Oven Style Pizza' all words same size and on one version, reduce 'Style,'" and would "Develop strong Brick Oven imagery to compete with FRESCHETTA."

In February 2004, Kraft began to sell TOMBSTONE BRICK OVEN STYLE pizzas to grocery stores. Kraft also markets its pizza to consumers as BRICK OVEN STYLE, TOMBSTONE BRICK OVEN, and as BRICK OVEN. By the end of 2004, and without any advertising support, Kraft's sales of its BRICK OVEN STYLE pizzas totaled $37 million.

Based on Schwan's prior growth rate, that company projected that its 2004 gross sales of its BRICK OVEN pizzas would total $84 million, but the 2004 sales ultimately reached only $76 million. Schwan's attributes its market losses to the entry of Kraft's BRICK OVEN STYLE pizzas.

### C.    Market Analysis: Frozen vs. Restaurant

It is undisputed that thousands of restaurants have used the term BRICK OVEN to describe either the ovens in which the pizza is baked or the restaurants themselves. But Schwan's seeks to distinguish the restaurant-pizza market from the frozen-pizza market, noting that the points of sale and cooking methods differ: frozen pizzas are sold in grocery refrigerators, not in restaurants, and are baked in home kitchens, not in commercial ovens. Schwan's argues that because the markets differ, any restaurant use of the term is irrelevant for trademark purposes. Further, Schwan's contends that the restaurants do not describe the products themselves, but they merely describe either the restaurants or the *manner* in which the products are baked.

The record contains expert testimony that BRICK OVEN refers to the oven itself and does not refer to a *style* of pizza—an analysis consistent with Kraft's expert testimony that hearth ovens or brick ovens can create a variety of pizzas, including thin crust, deep dish, and everything in between. But Schwan's consumer research also indicates that some consumers associate BRICK OVEN with a style of pizza with specified physical characteristics, such crust height, crispness of crust, or the amount or type of cheese.

### D.      Alleged Consumer Confusion

Schwan's points to three instances of alleged actual consumer confusion. A chain of Omaha grocery stores, No Frills Supermarkets, mistakenly promoted Schwan's FRESCHETTA BRICK OVEN pizza when it actually intended to promote Kraft's TOMBSTONE BRICK OVEN STYLE pizza. Schwan's also points to a related incident where a Wal-Mart shopper had "ad-matched" using the No Frills ad to obtain a discount on a FRESCHETTA BRICK OVEN pizza, rather than the TOMBSTONE pizza actually on sale. Lastly, Schwan's points to evidence that grocer Bag 'N' Save mistakenly listed a sale on FRESCHETTA when no such sale was in place.

### E.      Schwan's Trademark Applications

The United States Patent & Trademark Office ("PTO") has thrice denied Schwan's application to register the mark BRICK OVEN, ultimately holding that BRICK OVEN is a generic term, both to frozen pizza and to pizza generally. The PTO

attached 20 representative newspaper stories taken from the online LEXIS publications database showing generic use of BRICK OVEN PIZZA, and it noted that "[t]hese 20 stories were taken from a total of 1,472 that used the term BRICK OVEN PIZZA." Further, the PTO noted that rights were not granted in any of the seventeen other, prior applications that included the term BRICK OVEN. As such, the PTO stated that those "registrations show that, for at least the past 47 years, without exception, the [PTO] has found BRICK OVEN to be descriptive of baked goods." In denying Schwan's trademark application, the PTO concluded that BRICK OVEN "is the generic name for a type of pizza."

After oral argument in this matter, the PTO issued its "final" rejection of Schwan's two trademark applications: FRESCHETTA BRICK OVEN on April 29, 2005, and BRICK OVEN for frozen pizza on May 18, 2005. The PTO concluded in its rejection of both asserted marks that "[t]he overwhelming evidence shows that BRICK OVEN is a generic term when used in connection with pizza, including frozen pizza. For these reasons the [PTO decisions are] maintained and made FINAL." (Emphasis in original.)

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates "no genuine issue as to any material fact" and judgment is appropriate as a matter of law. FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986). If a plaintiff fails to support an essential element of its claim, summary judgment is appropriate because all other facts are immaterial. <u>Celotex Corp.</u>, 477 U.S. at 322-23. But all evidence and justifiable interferences are viewed in a light most favorable to the non-moving party.

A plaintiff bears the burden of establishing secondary meaning. <u>Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.</u>, 780 F.2d 1324, 1330 (8th Cir. 1985). A defendant has the burden of showing that the fair use defense applies. <u>DowBrands, L.P. v. Helene Curtis, Inc.</u>, 863 F. Supp. 963, 967 (D. Minn. 1994). Summary judgment is inappropriate if the evidence is such that a reasonable jury can return a verdict for the nonmoving party. <u>Woodroast Sys., Inc. v. Restaurants Unlimited, Inc.</u>, 793 F. Supp. 906, 911 (D. Minn. 1992), <u>aff'd</u> 994 F.2d 844 (8th Cir. 1993).

Kraft's first motion argues that, as a matter of law, (1) BRICK OVEN PIZZA is generic, (2) BRICK OVEN lacks secondary meaning, or (3) Kraft's use of BRICK OVEN STYLE is fair use.

**B.    "Brick Oven" as Generic Term**

Kraft first argues that the term BRICK OVEN is an unprotectible generic term. In trademark law, words are classified in the following categories, arranged from least to most protectible: generic, descriptive, suggestive, and arbitrary. <u>See General Mills, Inc. v. Kellogg Co.</u>, 824 F.2d 622, 625 (8th Cir. 1987). A generic term is a "common descriptive name for [a] type, genus, or class of goods" and is

8

"precluded from trademark protection under any circumstances." <u>General Mills</u>, 824 F.2d at 625. A descriptive mark "designates characteristics, qualities, effects, or other features of the product" and is protectible only upon a showing of secondary meaning. <u>Id.</u> Suggestive marks require "imagination to reach a conclusion as to the product's nature" and are protected without establishing secondary meaning. <u>Id.</u> Lastly, arbitrary marks are words, symbols, or pictures in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality, or characteristic of those goods or services. MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION, § 11.11, at 11-16.

Genericness can be demonstrated "from any competent source." <u>In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.</u>, 828 F.2d 1567, 1570 (Fed. Cir. 1987) (citation omitted). Such sources may include a plaintiff's generic use, competitors' uses, third-party use in trademark registrations, and other publications. <u>See Nartron Corp. v. STMicroelectronics, Inc.</u>, 305 F.3d 397, 406-07 (6th Cir. 2002). If a mark is found to be generic, no amount of secondary meaning may resurrect it, and no party may be found to infringe it. <u>E.g.</u>, <u>Retail Servs. Inc. v. Freebies Publ'g</u>, 364 F.3d 535, 547 (4th Cir. 2004) ("Evidence establishing a likelihood of confusion simply do[es] not bear upon the question of whether [a] trademark . . . [is] generic.") (quotation omitted, alterations in original); <u>In re Northland Aluminum Prods., Inc.</u>, 777 F.2d 1556, 1558 (Fed. Cir. 1985) (because BUNDT is

generic term, proffered evidence of secondary meaning irrelevant). A party asserting unregistered trademark rights bears the heavy burden of establishing those rights. Ale House Mgmt., Inc. v. Raleigh Ale House Inc., 205 F.3d 137, 140 (4th Cir. 2000) (affirming summary judgment that "ale house" for food and drink establishment is generic).

### 1.    Resolution of Genericness Through Summary Judgment

Schwan's looks to the Fifth Circuit for the proposition that genericness is an issue that may not be resolved in summary judgment. See Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs, Inc., 41 F.3d 223, 225 (5th Cir. 1995) (holding summary judgment improper, where generic status and likelihood-of-confusion are "fact-intensive inquiries [that] cannot be conducted properly without a trial"). But the Eighth Circuit has held that a mark may be held generic as a matter of law. Best Buy Warehouse v. Best Buy Co., Inc., 920 F.2d 536, 537 (8th Cir. 1990) (affirming grant of summary judgment in 751 F. Supp. 824 (W.D. Mo. 1990)); see Nupla Corp. v. IXL Mfg. Co., 114 F.3d 191, 196 (Fed. Cir. 1997) (affirming summary judgment that term CUSH-N-GRIP was generic for tool handles). As such, the genericness of a term may be determined on summary judgment.

**2.     Trademark Application before PTO**

Kraft contends that Schwan's three unsuccessful applications before the

PTO demonstrate that BRICK OVEN is generic or, at most, descriptive without

secondary meaning. As noted above, both of the PTO's final rejections of Schwan's

applications stated,

> The overwhelming evidence shows that BRICK OVEN is a
> generic term when used in connection with pizza,
> including frozen pizza. For these reasons the [agency's
> provisional decision] is maintained and made **FINAL**.

(PTO Office Action dated Apr. 29, 2005; PTO Office Action dated May 18, 2005)

(emphasis in original).

Schwan's objects to the introduction of this evidence, claiming that—

despite the PTO's use of the word "final"—their rejections are not, in fact, final

decisions. See Everest Capital Ltd. v. Everest Funds Mgmt., LLC, 393 F.3d 755,

764 (8th Cir. 2005) (holding that district court acted within its discretion in

excluding from the jury evidence of PTO's "tentative opinion" as unfairly

prejudicial under Fed. R. Evid. 403) (citing Johnson v. Yellow Freight Sys., Inc.,

734 F.2d 1304 (8th Cir. 1984) (considering EEOC investigation)). But Everest

disapproved of a court's considering an agency's tentative opinion, rather than

properly waiting for "an administrative finding of fact based upon an adequate

record." Here, the PTO clearly stated that its decision was "made final," and the

fact that Schwan's may choose to challenge or appeal these final decisions does

not make them any less final. Further, the record demonstrates that the PTO's

decision was based upon a full and adequate record. Thus, although the PTO's decision is by no means dispositive of the issue before this court, it is admissible as persuasive evidence. That said, this Court does not wholly base its order upon the PTO decisions; rather, it reaches the same conclusion as that agency: that the term BRICK OVEN is not descriptive but is instead a generic term as applied to all pizzas—frozen or restaurant-baked.

### 3.   Evidence of Generic Status

The evidence in the record demonstrates that the term BRICK OVEN is generic with respect to pizza, frozen or otherwise. It is clear that "brick oven pizza" is merely pizza cooked in a brick oven. Tom Bierbaum, Schwan's longtime head of the FRESCHETTA brand and the person who selected the mark BRICK OVEN, confirmed this usage in his deposition:

> Q.   By that, do you mean – by calling it a brick oven pizza, you are intending to communicate that it is a pizza that was cooked in an authentic brick oven?
>
> A.   If you break it down to that, yes, **a pizza that is cooked in a brick oven**.
>
> Q.   Like the ones from Italy from way back when?
>
> A.   Correct.
>
> Q.   That's what you intended to communicate to consumers?
>
> A.   Yes

(Bierbaum Dep. 31:12-22) (emphasis added). Schwan's culinary counsel similarly conceded that "brick oven pizza" is pizza cooked in a brick oven.

It is undisputed that thousands of companies use the term BRICK OVEN PIZZA. Further, Schwan's patent application[2] undisputedly indicates that BRICK OVEN is a type or style of pizza that appears to have been "baked in a brick wood fired oven providing a crispy exterior, a soft interior crust having characteristic toasted color indicia," and which "mimics the nature of a hand made, brick-oven baked product." In contrast, Schwan's argues in this trademark action that BRICK OVEN is not a "type" or "style" but that it is, instead, indicative a baking location. Such polar positions are difficult to reconcile. The evidence demonstrates that a "brick oven" pizza is a type or style of pizza that may be sold either in restaurants or in the frozen-food aisle of a supermarket.

Lastly, the term BRICK OVEN was used with reference to frozen pizzas well before Schwan's introduced their product. Schwan's concedes that, from 1992 to 1996, Weight Watchers sold frozen pizzas under the name BRICK OVEN STYLE. Other frozen pizzas, Market Day BRICK OVEN pizza and Meijer BRICK OVEN STYLE, have subsequently adopted the BRICK OVEN term to describe their products. This evidence demonstrates that not only have thousands of competitors used the BRICK OVEN mark in restaurants, but others have used—and continue to use—the

---

[2] The validity of Schwan's patent application is not in dispute, but its contents are illuminating because it pertains to the manufacture of Schwan's BRICK OVEN pizza.

mark even in the very narrow frozen-pizza market that Schwan's asserts is relevant here.

In light of the above, the record contains undisputed evidence strongly showing that the mark BRICK OVEN is generic as a matter of law. As such, Schwan's is not entitled to exclusive use of that term.

### C.    Secondary Meaning of "Brick Oven"

Kraft further contends that BRICK OVEN lacks the secondary meaning necessary to establish a protectible trademark. The Court agrees that even if BRICK OVEN were descriptive, not generic, it lacks the secondary meaning to make it protectible.

If a term is descriptive, the party seeking protection must show that the term has secondary meaning, or that consumers associate the term with a "single source," which consumers need not know by name. Stuart Hall Co. v. Ampad Corp., 51 F.3d 780, 789 (8th Cir. 1995). Said another way,

> To establish secondary meaning, the user must show that the mark or symbol by long and exclusive use and advertising in the sale of the user's goods has become so associated in the public mind with such goods that it serves to identify them and distinguish them from the goods of others.

Co-Rect Prods., 780 F.2d at 1330, 1332 (citations and modifications omitted).

## 1.    Long and Exclusive Use

As noted above, one requirement for secondary meaning is that the mark have "long and exclusive use and advertising in the sale of the user's goods." Schwan's does not dispute that its Brick Oven product entered the market only one year before Kraft's product. See Co-Rect Prods., 780 F.2d at 1332 ("Although no specific rule exists with respect to how long a mark must be used, we feel that in these circumstances ten months is simply not sufficient time to establish secondary meaning in the marketplace."); see also Security Ctr., Ltd. v. First Nat'l Sec. Ctrs., 750 F.2d 1295, 1301 (5th Cir. 1985) (two years insufficient); Bank of Texas v . Commerce Southwest, Inc., 741 F.2d 785, 788 (5th Cir. 1984) (nine years insufficient). This short timeframe, under these circumstances, is insufficient for Schwan's to demonstrate the requisite secondary meaning.

## 2.    Consumer Surveys

Another manner of demonstrating secondary meaning is through consumer surveys. Schwan's has commissioned two such surveys in its attempt to establish secondary meaning: the Simonson Survey and the Mantis Survey.

### (a)    Simonson Survey

First, Schwan's commissioned Dr. Alexander Simonson to conduct a survey ("Simonson Survey") of 400 potential purchasers at malls in eight U.S. locations, where participants were shown a Schwan's commercial twice and were then able

to browse a realistic computerized simulation of a grocery store frozen pizza aisle. The sample was randomly split into a control group and a test group, where the control group was questioned as to whether the commercial related to the TOMBSTONE ORIGINAL product, and the test group was asked the same questions about the TOMBSTONE BRICK OVEN STYLE pizza.

Schwan's argues that its Simonson survey demonstrates secondary meaning by showing that between 13% and 14% of consumers believe there is an association between the BRICK OVEN and BRICK OVEN STYLE brands. But the Simonson Survey is not persuasive with regard to secondary meaning because participants were improperly shown Schwan's product, thereby forcing their awareness of the product, rather than gauging the participants' pre-existing awareness. See Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) ("The second major flaw we discern in the Rappeport Survey is that every respondent was exposed to the [plaintiff's] product in the first room, thus acquainting them with a product that they would almost certainly have been unfamiliar with otherwise, due to [plaintiff's] very limited distribution network and weak sales."). Simonson himself agreed in his deposition that he is not aware of any court that has accepted or authorized his simulation's methods. He further testified that his survey "do[es] not attempt to measure secondary meaning." As such, Simonson's survey is flawed and does not support a finding of secondary meaning.

### (b)   Mantis Survey

Schwan's next points to a survey by George Mantis ("Mantis Survey"),
conducted in the summer of 2004—a few months after Kraft's market entry of its
BRICK OVEN STYLE pizzas. This was a *Teflon*-type survey, in which respondents are
first instructed on the definition of common names and brand names, pre-tested
on their understanding of common names and brand names, and then asked to
categorize certain test and control phrases or words as brand names or common
names. See, e.g., E.I. DuPont de Nemours & Co. v. Yoshida, Int'l, Inc., 393 F.
Supp. 502, 526-27 (E.D.N.Y. 1975) (analyzing *Teflon*-type survey); March
Madness Athletic Ass'n L.L.C. v. Netfire, Inc., 310 F. Supp. 2d 786, 803 (N.D. Tex.
2003), *aff'd* 2005 WL 147264 (5th Cir. 2005). A *Teflon* test is generally an
accepted format to measure secondary meaning. March Madness Athletic Ass'n,
310 F. Supp. 2d at 809 (relying, in part, on a Mantis *Teflon* survey as evidence of
secondary meaning).

Schwan's argues that the Mantis Survey demonstrates secondary meaning
in that 61% of the respondents believed that BRICK OVEN was a brand name that
originates from "one particular company." But the Mantis Survey was conducted
months after Kraft's BRICK OVEN STYLE product had already entered the market; as
such, that survey is irrelevant for the establishment of secondary meaning. See
Co-Rect Prods., Inc. v. Murvy! Advertising Photography, Inc., 780 F.2d 1324,
1330 (8th Cir. 1985) (to establish secondary meaning, a user must "show that

secondary meaning existed **_prior to_** the date on which the defendant commenced using the same or similar mark") (citation omitted and emphasis added). Mantis himself admitted that his survey did not attempt to measure secondary meaning any earlier than June and July of 2004—several months *after* Kraft's launch. (Mantis Dep. at 56) ("Q. So your survey measures a point in time of July and June 2004? A. Yes"). Accordingly, the Mantis Survey also fails to demonstrate the requisite secondary meaning.

### 3.    Advertising

Schwan's argues that its extensive advertising and promotional efforts help demonstrate that BRICK OVEN holds secondary meaning. In certain circumstances, advertising and sales figures can be circumstantial evidence of secondary meaning, but "it is the effect of such advertising that is important, not its extent." Shade's Landing, Inc. v. Williams, 76 F. Supp. 2d 983, 990 (D. Minn. 1999) (quoting Co-Rect Prods., 780 F.2d at 1332). Summary judgment may be appropriate for lack of secondary meaning, even with advertising support:

> It is well established that the effort to promote a conscious connection between a trade dress and a source must be both more specific, and more concerted than mere advertising per se. Yankee has pointed to no advertising emphasizing [its mark's] design or configuration as a product identifier.

Yankee Candle Co. v. Bridgewater Candle Co., 99 F. Supp. 2d 140, 154-55 (D. Mass. 2000) (granting summary judgment for lack of secondary meaning)

(footnote omitted). For advertisements to establish secondary meaning, they must

separate the claimed mark from the product's other identifying marks.

Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 871 (8th Cir. 1994)

> In none of the advertisements is the dress depicted
> without such identifying marks. The advertisements
> submitted with the application cannot establish
> secondary meaning because they do not separate the
> claimed dress of the products from the other marks that
> serve to identify the products as those of Aromatique.

Id.; see Goddard, Inc. v. Henry's Foods, Inc., 291 F. Supp. 2d 1021, 1047-48 (D.

Minn. 2003) (granting summary judgment for lack of secondary meaning and

rejecting advertising as irrelevant, noting, "we are unable to assess the relevance

of Freshway's advertising expense, as we have no showing that those

advertisements were aimed at familiarizing the public with the identity of

Freshway's products, by virtue of its trade dress, as opposed to some other aspect

of the Plaintiff's product, or business.") (citation omitted).

Here, Schwan's advertising is irrelevant because, although it provides a

*description* of Schwan's product, it does not function to identify the source.

Schwan's advertising emphasizes that its BRICK OVEN pizzas are "thin," "firebaked,"

and "crispy," all of which describe the characteristics of a pizza cooked in a brick

oven. Schwan's has failed to demonstrate that its advertising has served to

identify the source of the product, rather than its characteristics.

Further, Schwan's internal documents state that in March 2004, the consumer awareness of its FRESCHETTA brand, which includes its BRICK OVEN product, "continues to be low." Where Schwan's concedes that it had low FRESCHETTA brand awareness in March 2004—one month after Kraft launched its BRICK OVEN STYLE pizzas—then it cannot persuasively argue that during the same period, its BRICK OVEN pizzas enjoyed the high consumer awareness to demonstrate secondary meaning.

### 4.  Conclusion: Secondary Meaning

In addition to being a generic term, BRICK OVEN also lacks secondary meaning. Because the record lacks evidence demonstrating that Schwan's enjoyed long and exclusive use of the BRICK OVEN mark, because the proffered surveys fail to demonstrate sufficient secondary meaning, and because advertising described product characteristics rather than serving as a source identifier, Schwan's has failed to demonstrate the secondary meaning required to overcome summary judgment.

### D.  Fair Use

Because the Court holds that the term BRICK OVEN is generic or—at most—descriptive without the requisite secondary meaning, the Court need not analyze Kraft's argument that its actions constitute fair use.

### E.     Likelihood of Consumer Confusion

Similarly, because the Court holds that Schwan's has no exclusive rights in the term BRICK OVEN, Kraft's second motion for summary judgment—arguing that no reasonable jury could find a likelihood of consumer confusion—is rendered moot.

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that;

1.     Defendant and Counter-Claimant Kraft Pizza Company's First Motion for Summary Judgment [Docket No. 21] is **GRANTED**; and

2.     Defendant and Counter-Claimant Kraft Pizza Company's Second Motion for Summary Judgment [Docket No. 29] is **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: July 28, 2005                    s/ Michael J. Davis
                                        Judge Michael J. Davis
                                        United States District Court